IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| ROBERT ZLAHN,<br><br>          Petitioner,<br><br>     vs.<br><br>PATRCK MCTIGHE, ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>          Respondent. | Cause No. CV 18-158-BLG-SPW-TJC<br><br><br>FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

This case comes before the Court on Petitioner Robert Zlahn's application for writ of habeas corpus under 28 U.S.C. § 2254.  Zlahn is a state prisoner proceeding pro se and in forma pauperis.

Following review of his initial petition, Zlahn was advised that he had failed to advance any claims that were cognizable in federal habeas.  See, (Doc. 9.) Zlahn was afforded an opportunity to submit an amended petition and was advised he must explain what federal constitutional violation(s) he was asserting.  Zlahn was also informed of the applicable standard of review.  *Id*. at 3-5.  Zlahn timely submitted an Amended Petition on the Court's standard form, (Doc. 11), a handwritten Amended Petition, (Doc. 11-3), and a supplement to his petition. (Doc. 12.)  Zlahn has also filed an Inmate Special Request Form from the Yellowstone County Detention Facility, (Doc. 11-4 at 2); a portion of a transcript

1

from a 911 recording, *Id*. at 4-5; a portion of an interview of Mr. Keelan Scally, *Id*. at 7-8; a portion of a transcript from the State's closing argument in Zlahn's trial, *Id*. at 10; a copy of a Subpoena issued for Ms. Michelle Wellard, *Id*. at 12; and, a copy of Zlahn's Motion to Reduce Bond and Request for Hearing. *Id*.

The Court is required to examine a petition for federal habeas corpus relief before requiring a response. See, Rules 3 & 4, Rules Governing § 2254 Cases. "If it plainly appears from the petition…that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition." For the reasons explained herein, Zlahn is not entitled to relief and his claims should be denied.

## I.    Factual and Procedural History

The Montana Supreme Court set out the facts of Zlahn's case as follows:

> On July 1, 2011, Alanna Vincent (Vincent) was returning to her home in the Billings Heights after doing some grocery shopping at the nearby Walmart. She noticed two black men in a dented maroon van make a U-turn to follow her vehicle. She parked her vehicle in front of her home and watched as the van drove by slowly. As she was getting out of her car, the van turned around to pull up beside her. Through the open window, the driver, a short-haired black man with a gap in his teeth, asked her whether she wanted to get in the van and have intercourse. She noticed that he had an accent. Feeling threatened, Vincent told the men to leave her alone and ran into her home. There, she told her boyfriend, a body builder and former football player, Ryan Grosulak (Grosulak), what had happened.
>
> Grosulak began driving around the neighborhood in search of the dented maroon van with two black men in the front seats. He caught up with a vehicle that matched that description not far away. He rolled down the window of his car, yelled at the men about their behavior towards Vincent

using some choice language, and made an obscene gesture. A "skinny white kid" jumped out of the back and wanted to fight. Then the driver stepped out of the car and began returning Grosulak's obscenities. Grosulak stepped out of the car. When he did so, "just bullets just start flying, like I just got totally stunned." He said the van's driver, who had short or buzzed hair and was wearing a bright green shirt, was the shooter, although he did not see the gun. He later testified that the gun was a silver pistol. Terrified, Grosulak dove back into his car and began both driving away and calling 9-1-1. While he was on the phone with the 9-1-1 dispatcher, he returned to the apartment.

Officer Joseph Dickerson (Officer Dickerson) was employed with the Billings Police Department at the time as a patrol officer. At about 2:57 p.m. he received a dispatch for shots fired in the Heights and arrived at a nearby residential address where another officer believed he had apprehended the suspects. The suspects were Zlahn, a black man who had short hair and was wearing a green shirt; Samuel Bettie (Bettie), a black man who had dreadlocks at the time; and Sean Bowers (Bowers), a young white man. The address belonged to Bowers's grandmother.

Officer Dickerson spoke with Zlahn at the scene. Officer Dickerson noticed that Zlahn had an accent. Zlahn said he had dropped his girlfriend off at work, then his vehicle had broken down and he had found someone to push his vehicle from where it had broken down several miles away to its current location. He denied involvement with the shooting.

Officers also spoke with Bowers at the scene. Bowers initially denied being in the van and said he had just met Bettie and Zlahn on the street. He also said that he was going to meet his mother at Walmart. He later changed his story and admitted to being present for the altercation. He said he heard three shots fired, but did not know who had fired them. He said the shots came from the driver's side of the vehicle. When officers asked Bowers where the weapon was, he pointed to a bush. There the officers recovered a gun. The gun was a .45 caliber that was ready to fire. Officer Dickerson bagged and inventoried the weapon.

The police transported Zlahn, Bettie, and Bowers to the City Hall where a detective administered gunshot residue (GSR) tests to all three men. Zlahn became agitated when the detective said he would be doing GSR testing, while the other two men remained calmer. The GSR tests revealed that all

three suspects had been in close proximity to the gun when it was fired; however, it did not show which of the suspects had fired the gun. Comparisons of DNA found on the gun with the suspect's DNA showed that Zlahn's DNA was a "major contributor" to the DNA profile, but that Bettie's was not. The expert who testified said that the DNA profile from the gun was a "mixed" profile with probably three to four contributors. She explained that the fact that Bettie's DNA did not appear on the gun did not mean that Bettie could not have handled the gun or been the shooter. It appears there was no comparison of Bowers's DNA with the DNA found on the gun.

Later on July 1, 2011, an officer arrived at Vincent's and Grosulak's apartment to transport them to the place where the van had been apprehended. Vincent and Grosulak both were sure the van in which the suspects were apprehended was the one they had seen. A detective arrived afterwards to show them photographic line-ups. Grosulak could not identify the shooter from any line-ups because he said events had happened too quickly for him to be able to identify anyone. Vincent identified Zlahn as the person who had been driving the van when the offensive remarks were made. Following Zlahn's arrest, the keys to the van were found among Zlahn's belongings. The van was registered to Zlahn's girlfriend.

Zlahn was charged with felony attempted deliberate homicide in Yellowstone County Justice Court. Zlahn appeared before a justice of the peace on July 5, 2011, and, through a public defender who had come to court to represent all defendants on the jail-court calendar that day, requested to be represented by a public defender. The justice of the peace ordered the Office of the State Public Defender (OPD) to represent Zlahn and ordered the State to file an information in district court by July 12, 2011. Pursuant to an internal policy not to assign attorneys to felony defendants until after the defendants have been arraigned in district court, OPD did not assign a public defender to Zlahn immediately. The State did not file its information until July 21, 2011. Zlahn was arraigned in District Court on July 25, 2011. At his arraignment he was represented by another on-duty public defender, who spoke with him for approximately two minutes before court. The District Court ordered OPD to represent Zlahn. However, no public defender was assigned to represent Zlahn until August 11 or 12, 2011- approximately five weeks after he first appeared in court related to the felony charges against him and three weeks after he was arraigned. As a result, Zlahn did not have representation during the ten-day window in which he could have been

4

advised of, and exercised, his right to substitute the judge.  On April 20, 2012, the State amended its information to add, as an alternative to attempted deliberate homicide, counts of assault with a weapon, criminal endangerment and witness tampering.  A jury trial was held from July 16-24, 2012.

At trial, eyewitnesses testified as to the shooter's identity.  Bowers testified that Zlahn was the shooter.  Two eyewitnesses testified that the driver of the van was the shooter.  Zlahn sought jury instructions on factors that affect reliability of eyewitness identifications, such as difficulties with cross-racial identification.  The District Court refused those instructions.  Over Zlahn's counsel's objections, the District Court also permitted admission of evidence regarding a stockpile of condoms found in the suspect van; an officer's testimony about what criminals think about the strength of GSR testing; and officer's account of how often other witnesses, in other cases, have picked people out of photo line-ups; and an officer's video and testimonial evidence as to the eyewitnesses' vantage points.  Zlahn's counsel sought and was denied a mistrial following a comment by the District Court that he believed reflected on Bowers's credibility.

*State v. Zlahn*, 2014 MT 224, ¶¶ 3-11, 376 Mont. 245, 332 P.3d 247.[1]

Following the jury trial, Zlahn was found not guilty of attempted deliberate homicide, but was convicted of assault with a weapon, criminal endangerment, and tampering with evidence.  (Doc. 11 at 2.)  The district court sentenced Zlahn to the Montana State Prison for thirty-years with five of those years suspended.

Zlahn timely filed a direct appeal arguing: (1) failure to immediately appoint counsel violated his constitutional and statutory rights, (2) the district court erred in denying the instructions regarding factors affecting reliability of eyewitness

---

[1] Zlahn included the Montana Supreme Court decision on direct appeal in the materials attached to his Amended Petition.  See, (Doc. 11-1.)

identification, (3) the district erred in evidentiary rulings related to condoms found in the van, GRS testing, line-up statistics, and vantage point evidence, (4) the district court abused its discretion when it refused to declare a mistrial based upon comments it made to Bowers, and (5) cumulative error warranted a new trial.  See, (Doc. 11-1 at 2.)  The Montana Supreme Court affirmed Zlahn's convictions.  *Id*. at 8-21.[2]  The decision issued on direct appeal is discussed in further detail below.

Zlahn then sought postconviction relief (PCR) in the state district court alleging ineffective assistance of trial counsel.  The state district court dismissed several of Zlahn's claims but allowed Zlahn's claim that trial counsel was ineffective for failing to call a critical witness, Amber Scally, to proceed.  The State was ordered to respond to this claim.  Following review of the State's response, the district court dismissed Zlahn's petition in its entirety.  See, (Doc. 11-2 at 2-3.)

On appeal, the Montana Supreme Court determined trial counsel's decision not to call Amber Scally as a witness was consistent with its theory of the case and did not constitute deficient performance.  *Id*. at 4-5.[3]  The Court also determined it

---

[2] Zlahn included the Montana Supreme Court decision on direct appeal, *State v. Zlahn*, 2014 MT 224, 376 Mont. 245, 332 P. 3d 247, in the materials attached to his Amended Petition.  See, (Doc. 11-1.)

[3] Zlahn also attached a copy of the Montana Supreme Court's memorandum opinion in *Zlahn v. State*, 2018 MT 250N to his amended petition.  See, (Doc. 11-2.)

6

was objectively reasonable for trial counsel not to pursue locating a potential alibi witness, who was only known by his first name, "Derek." *Id*. at 5-6. The Court affirmed the denial of Zlahn's PCR petition. This decision will also be discussed further below.

## II.     Zlahn's Claims

Zlahn claims: (i) his federal right to counsel was violated when the Office of the Public Defender (OPD) failed to appoint him counsel until 38 days after his initial arrest, (Doc. 11-3 at 2-8); (ii) the state district court committed error in its evidentiary rulings when it: failed to properly instruct the jury regarding eyewitness identifications, allowed the tainted testimony of Sean Bowers into evidence, allowed unrelated condom information into evidence, admitted prejudicial opinion and hearsay evidence from a detective regarding what suspects generally believe about gunshot residue testing, allowed admission of irrelevant photo lineup evidence, and, admitted unauthorized vantage point hearsay testimony into evidence; *Id*. at 10-15; and, (iii) trial counsel provided ineffective assistance by failing to call exculpatory witness Amber Scally and failing to investigate Zlahn's alibi witness, Derek. *Id*. at 16-18.

## III.    Analysis

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground

that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).  ("A necessary predicate for the granting of federal habeas relief to respondents is a determination by the federal court that their custody violates the Constitution, laws, or treaties of the United States.").

Additionally, because the Montana Supreme Court has addressed the merits of Zlahn's claims, this Court's review is limited further.  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides a federal habeas court may not grant relief to a state prisoner whose claim has already been "adjudicated on the merits in State court," 28 U.S.C. § 2254(d), unless the claim's adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by [this] Court," § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2); see also, *Johnson v. Williams*, 568 U.S. 289, 292 (2013).

AEDPA substantially limits the power of federal courts to grant habeas relief to state prisoners, *Hurles v. Ryan*, 725 F. 3d 768, 777 (9th Cir. 2014), and "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential

standards kick in." *Davis v Ayala*, 576 U.S. 257, 269 (2015) (citations omitted).

"A state court's determination that a claim lacks merit precludes federal habeas

relief so long as 'fairminded jurists could disagree' on the correctness of the state

court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has

instructed "that even a strong case for relief does not mean the state court's

contrary conclusion was unreasonable." *Id.* at 102 (citations omitted); see also,

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)(describing the standard as "difficult

to meet" and a "highly deferential standard for evaluating state-court rulings,

which demands that state-court decisions be given the benefit of the doubt.")

For the reasons explained below, Zlahn's claims do not survive deferential

review and should be denied.

### i.     Right to Counsel

On direct appeal, Zlahn requested the Montana Supreme Court exercise

plain error review[4] and find that the failure to appoint him counsel for five weeks

---

[4] The Montana Supreme Court will generally not consider issues raised for the first
time on appeal.  To obtain plain error review, the appellant has the burden of
establishing: (1) the alleged error implicates a fundamental right; and (2) failure to
review the alleged error would result in a manifest miscarriage of justice, leave
unsettled the question of fundamental fairness of the proceedings, or compromise
the integrity of the judicial process.  See, *In re M.K.S.*, 2015 MT 146, ¶¶ 13-14,
379 Mont. 293, 350 P. 3d 27.

violated his statutory and constitutional rights and tainted the fundamental fairness of the proceedings.  (Doc. 11-1 at ¶ 19.)  Zlahn also argued the failure to appoint counsel during this period prevented him from exercising his statutory option to substitute the trial judge.  *Id*.[5]  The Court declined to exercise plain error review.

The Court found that although Zlahn did not have a specific attorney from the Office of the Public Defender (OPD) for five weeks into his state court proceedings, counsel appeared with Zlahn at both of his initial court appearances. *Id*. at ¶ 20.  Once Zlahn was arraigned, he was assigned counsel within two to three weeks, pursuant to OPD policy.  *Id*.  In relation to the 10-day window in which Zlahn could have substituted the district court judge, the Court found it had never determined this timeframe constituted a "critical stage," nor was there any indication that Zlahn actually wanted to substitute the judge.  *Id*.  Once counsel was assigned, Zlahn never objected to the presiding judge or claimed the OPD's failure to assign counsel precluded him from substituting the judge.  *Id*.  The Court observed that while OPD "could have acted more swiftly," the failure to do so "did not give rise to a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the

---

[5] See, Mont. Code Ann. § 3-1-804(1), "Each adverse party is entitled to one substitution of a district judge."  In a criminal action, a motion for substitution "must be filed within 10 calendar days after the defendant's arraignment."  Section 3-1-804(1)(b), MCA.

10

judicial process," defeating Zlahn's request for plain error review.  *Id.*

Before this Court, Zlahn essentially recasts the arguments made at the state-level, and argues that the delay in appointing him counsel resulted in actual injury because he was left without counsel during critical stages of his proceedings.  See generally, (Doc. 11-3 at 5-8.)  Specifically, Zlahn argues that he was unable to: challenge the initial charges against him and/or request a probable cause hearing, *id*. at 5-6; request a reduction of his bond, *id*. at 6; or, move to substitute the judge under state statute.  *Id*. at 6-7.

To the extent that Zlahn attempts to argue his right under the Montana statute providing for substitution of the district court judge was violated, such a claim turns on the application of state law and is not cognizable before this Court. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas corpus relief does not lie for errors of state law); see also *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

Zlahn further argues, however, that his right to counsel along with his right to due process and equal protection were all violated by the delay in appointing counsel, because he was denied pretrial probable cause and bond reduction hearings.  (Doc. 11-3 at 5-7.)  As a preliminary matter, once counsel was appointed, there was nothing to prevent counsel from requesting a reduction in bond.  Further, it appears that appointed counsel did make such a request on two

different occasions.  See e.g., (Doc. 11-4 at 12.)[6]  Neither bond reduction motion was successful.  Zlahn remained in pretrial detention until his trial on the bond set at his initial appearance.

Additionally, even if this Court were to assume that Zlahn's right to a probable cause determination was violated due to delay in the appointment of counsel, he still cannot establish a basis for this claimed federal constitutional violation.  The right to a probable cause determination stems from the Fourth Amendment, which "requires a timely judicial determination of probable cause as a prerequisite to detention."  *Gerstein v. Pugh*, 420 U.S. 103, 126 (1975).  A state must provide "a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest."  *Id*. at 125.  Nevertheless, "illegal arrest or detention does not void a subsequent conviction," and "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause."  *Id*. at 119. Zlahn is currently in custody as a result of his conviction and sentence.  He cannot challenge his conviction at this juncture based upon any alleged improprieties that

---

[6] In the 6/4/2012 bond reduction motion, counsel indicates that a similar request to reduce Zlahn's $200,000 bond was made on 8/26/2011 and following a hearing on the same day, the motion was denied.

occurred in connection with his pretrial detention.

The Montana Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law, see 28 U.S.C. § 2254(d)(1), and does not warrant federal habeas relief.

### ii.  Evidentiary Rulings

As set forth above, federal habeas relief is not available for an alleged error in the interpretation or application of state law. *Estelle*, 502 U.S. at 67-68; *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000). Accordingly, "evidentiary rulings based on state law cannot form an independent basis for habeas relief." *Rhoades v. Henry*, 638 F. 3d 1027, 1034 n. 5 (9th Cir. 2011). The Supreme Court has acknowledged a "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. *Estelle*, 502 U.S. 68-70; see also, *Dillard v. Roe*, 244 F. 3d 758, 766 (9th Cir. 2001). Habeas relief is thus only available if an evidentiary ruling was arbitrary, disproportionate to the end it was asserted to promote, or so prejudicial that it rendered the trial fundamentally unfair. See, *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Walters v. Maass*, 45 F. 3d 1355, 1357 (9th

Cir. 1995).

Thus, even if a state trial court erred in admitting evidence and that error violated a petitioner's rights under the United States Constitution, to be entitled to federal habeas relief, a petitioner must still show that the error "had a substantial and injurious effect or influence in determining the jury's verdict" and that he suffered actual prejudice – that is, a "reasonable probability" that the jury would have reached a different result but for the error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).

### a. Eyewitness identification instructions

Zlahn argued on direct appeal that the district court erred in refusing to give his proposed jury instructions regarding factors affecting the reliability of eyewitness identification. The Montana Supreme Court held Montana law does not require that a jury be instructed specifically on eyewitness identifications, see (Doc. 11-1 at ¶ 23)(citing *State v. Hall*, 244 Mont. 161, 797 P. 2d 183 (1990)). Further, the Court found the substance of the rejected instructions was covered by other instructions and the instructions that were given properly instructed the jury regarding witness credibility. *Id*. To the extent that Zlahn wishes to challenge the Montana Supreme Court's application of state law in relation to eyewitness instructions, he cannot do so in this Court. *Estelle*, 502 U.S. 67-68.

But Zlahn also appears to argue the Montana Supreme Court's decision was

14

based upon an unreasonable determination of the facts, because the reliability of the eyewitness identifications was central to the ultimate outcome of the trial. (Doc. 11-3 at 11.) Zlahn asserts that the only shooting witness who knew him was Bowers, whom he characterizes as an admitted liar that received the benefit of reduced criminal charges in exchange for his trial testimony. *Id.* Zlahn also notes the forensic evidence was inconclusive, and none of the expert witnesses opined that Zlahn was the shooter. *Id.* Further, although the van belonged to his girlfriend, Zlahn states that Bettie was stopped driving the van the day before the shooting with Zlahn as a passenger. *Id.* Finally, Zlahn points out the "crucial testimony" that the shooter was wearing a bright green shirt – thus pointing to Zlahn – came from Grosulak, the witness under the most stress and, according to Zlahn, the most unreliable. *Id.* at 11-12. Based upon these facts, Zlahn argues the specific defense instructions surrounding eyewitness testimony were all the more critical. *Id.* at 12.

But contrary to Zlahn's assertions, the Montana Supreme Court found that Zlahn's case was **not** purely an eyewitness identification case. While there was one witness, Bowers, who identified Zlahn as the shooter, the conviction "hinged on cumulative circumstantial evidence derived from eyewitness testimony that was subject to cross-examination." (Doc. 11-1 at ¶ 24.) The Montana Supreme Court pointed out that more than one eyewitness identified Zlahn as either the driver of

15

the van or the shooter, and further stated:

> [t]he shooting was committed in public, in broad daylight, on a busy street.  Bowers, who knew Zlahn, testified under oath that he saw Zlahn shoot the gun.  Vincent identified Zlahn as the van's driver in a line-up.  Witnesses Michelle Wellard and Richard Morris said the driver of the van was the shooter.  Bowers also testified to that fact.  Grosulak told the police that the shooter was wearing a green shirt and Zlahn was wearing a green shirt when he was apprehended.  Zlahn was uncooperative with the GSR testing.  The key to open the van's door and start its ignition was found in Zlahn's property when he was arrested shortly after the shooting and the van belonged to Zlahn's girlfriend.  Zlahn was included as a probable contributor to the DNA found on the gun while Bettie most likely was not.  Since not only eyewitness identifications, but also an array of circumstantial evidence, pointed to Zlahn as the shooter, no jury instruction on eyewitness identifications was necessary…

*Id*.

Considering all of these factors, it appears that the Montana Supreme Court's decision upholding the district court's refusal of Zlahn's eyewitness jury instructions was a reasonable one.  Zlahn has not established that the Montana Supreme Court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Further, because "fairminded jurists could disagree" on the correctness of state court's decision, federal habeas relief is precluded.

*Harrington,* 562 U.S. at 101.

### b.  Testimony of Sean Bowers

Zlahn alleged the district court improperly commented on the credibility of a

witness, Sean Bowers, by making the following statement in the presence of the

jury:

> Mr. Bowers, I know you're trying to do your best today because
> you've mentioned you're under oath and you're trying to tell the
> truth and adhere to the subpoena that was issued, but the way the
> process works is Mr. Abbott asks the questions.

(Doc. 11-1 at ¶ 42.)  Outside the presence of the jury, Zlahn objected and moved

for a mistrial; the district court denied the motion.  The Montana Supreme Court

determined that, taken in context, the comment was not on Bowers' credibility, but

rather was an instruction to the witness who was reluctant to testify.  *Id*.  The Court

held there was no error in making the comment, and that the district court did not

abuse its discretion in denying the motion for a mistrial.  *Id*.

Zlahn argues that by inserting itself into matters outside the scope of its

function, as it did in addressing Bowers, the district court failed to act as an

impartial arbiter and violated his right to a fair trial.  (Doc. 11-3 at 12-13.)

Although not stated expressly, the Court presumes Zlahn is advancing a due

process violation based upon this perceived judicial bias.

"The Due Process Clause of the Fourteenth Amendment establishes a

constitutional floor, not a uniform standard" for a claim of judicial bias.  *Bracy v.

Gramley*, 520 U.S. 899, 904 (1997).  This floor requires "a fair trial in a fair

tribunal before a judge with no actual bias against the defendant or interest in the

outcome of his particular case."  *Id*. at 904-5.  One does not need to prove actual

17

bias to establish a due process violation, an intolerable risk of bias is sufficient. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986).  Due process mandates a stringent rule that "may sometimes require recusal of judges 'who have no actual bias and who would do their very best to weigh the scales of justice equally' if there exists a 'probability of unfairness.'"  *Hurles v. Ryan*, 752 F. 3d 768, 789 (9th Cir. 2014)(citing *In re Murchison*, 349 U.S. 133, 136 (1955)).  The circumstances and relationships between the parties must be considered when determining the potential for a probability of unfairness.  *Id.*

As set forth above, the Montana Supreme Court considered the relationship between the parties and concluded that the district court's comment was intended as an instruction to a reluctant witness and not a comment on his credibility.  This determination was a reasonable one.  Moreover, Zlahn has not established that either the circumstances involved or the relationship between the district court and Bowers created a probability of unfairness.  Thus, there was a reasonable basis for the Montana Supreme Court to deny this claim.  Under 28 U.S.C. § 2254(d), this Court must afford deference.

### c.  Condom Evidence

During trial and over Zlahn's objection, the district court admitted evidence that a large number of condoms were found inside the maroon van.  (Doc. 11-1 at ¶ 28.)  The state argued the condoms were relevant to Vincent's credibility. Vincent

alleged Zlahn had made sexual comments to her, accordingly, the presence of the condoms in the van tended to show Zlahn's interest in having sexual relations with women other than his girlfriend.  *Id*.  Zlahn argued the presence of condoms in the vehicle had no legitimate tendency to prove that the vehicle's driver made sexual comments to Vincent.  The Montana Supreme Court agreed with Zlahn, finding no relationship between the presence of condoms in the van and the alleged sexual comments, and that the admission of the evidence was more prejudicial than probative.  *Id*.  The Court held the district court abused its discretion by admission of this evidence.  *Id*.

Nevertheless, the Court also determined the error was trial error, not structural error.  Further, the Court found, in light of Vincent's testimony that Zlahn was willing to engage in promiscuous conduct, the condom evidence was cumulative.  Moreover, the Court determined the admission of evidence was harmless, did not prejudice Zlahn or affect his substantial rights, and did not necessitate a new trial.  *Id*. at ¶¶ 29-30.

Here, Zlahn argues evidence of a large number of condoms invited jurors to view him as promiscuous – a negative connotation with no legitimate relationship to the ultimate question of whether he was the shooter.  (Doc. 11-3 at 12.)  Further, Zlahn argues the unfair prejudice outweighed any legitimate probative value.  *Id*.

But the Montana Supreme Court found the lower court erred when it

19

admitted this evidence; Zlahn was not afforded relief because the error was deemed to be harmless.  To obtain relief in this Court, Zlahn must demonstrate that the error "had a substantial and injurious effect or influence in determining the jury's verdict" and that he suffered actual prejudice, that is, a "reasonable probability" that the jury would have reached a different result but for the error. *Brecht*, 507 U.S. at 637.  Zlahn has made no such showing; he simply restates the same argument advanced on direct appeal with which the Montana Supreme Court agreed.

Considering all of the testimony presented to the jury, see e.g. Montana Supreme Court's summary contained in III(ii)(a) *ante*, Zlahn has not provided any information which would establish that the introduction of the condom evidence, and an inference relating to Zlahn's potential promiscuity, had a substantial and injurious influence on the jury's verdict.  *Brecht*, 507 U.S. at 637.  This claim should also be denied.

### d. Gunshot Residue Testing

Zlahn challenged the admission of testimony surrounding gunshot residue (GSR) testing.  During trial, Zlahn objected to an officer testifying about what individuals involved in criminal activity think of GSR testing.  Specifically, the officer testified that in his experience, "people on the street believed that if GSR was found on their hands, they were caught." (Doc. 11-1 at ¶ 34.)  On appeal,

Zlahn argued the trial court erred by allowing this testimony regarding criminals'
perceptions of GSR testing because it included inadmissible hearsay. *Id.* The
Montana Supreme Court held the testimony was proper because the officer was
testifying based on his experience dealing with criminals and administering GSR
tests, and about the inferences he made based upon this experience. *Id.* at ¶ 35.
The Court found the officer was not testifying regarding specific statements
criminal defendants made or their overall demeanor, rather he testified generally
about his own impressions derived from his experience. *Id.* Further, the officer
testified that Zlahn was resistant to GSR testing, which tended to show Zlahn may
have believed such testing would incriminate him. *Id.* The Court determined this
opinion testimony was lay opinion testimony and properly admitted pursuant to M.
R. Evid. 701. *Id.*

Much as he argued in state court, Zlahn contends the officer's testimony is
inadmissible hearsay, to which no valid exception exists. (Doc. 11-3 at 13.)
Additionally, Zlahn maintains that the testimony is not an admissible lay opinion,
but rather expert opinion based upon hearsay. *Id.* But the admission of this
testimony turned on the state court's application of the Montana rules of evidence.
This state evidentiary ruling does not afford Zlahn an independent avenue to
pursue federal habeas relief. See, *Rhoades*, 638 F. 3d at 1034 n. 5. This claim
should also be denied.

### e.  Photo Line Up Testimony

Zlahn claimed on appeal that the district court erred when it allowed the detective who administered the photo array to Vincent to testify that it was rare for witnesses to identify suspects from photo line-ups. (Doc. 11-1 at ¶ 38.)  But the Montana Supreme Court pointed out that the defense presented evidence attacking Vincent's credibility in relation to her identifying Zlahn.  *Id*.  Therefore, the officer's testimony was relevant, because it related to Vincent's identification of Zlahn as the driver of the van.  *Id*.  The Court found there was no abuse of discretion in admission of the evidence.

Before this Court, Zlahn provides no additional factual or legal argument regarding what he believes to be unreasonable about the Montana Supreme Court's decision.  See generally, (Doc. 11-3 at 10-15.)  Accordingly, this Court must presume the decision is reasonable and afford the Montana Supreme Court's decision the benefit of the doubt.  See, *Woodford,* 537 U.S. at 24; see also, 28 U.S.C. § 2254(d).

### f.  Vantage Point Hearsay Testimony

Zlahn argued the district court erred in admitting photos and videos created by a police detective reproducing the position and viewpoints of various witnesses to the shooting.  Zlahn contended the items were derived from hearsay; thus, the testimony of a witness who was present for the shooting, and could attest to the

accuracy of the representations, was necessary to lay the proper foundation for admission. (Doc. 11-1 at ¶ 39.)  The Montana Supreme Court held the videos were not reenactments, but rather were meant to document physical distances and vantage points.  The Court recognized that Zlahn cross examined the detective, and all of the witnesses upon whose statements the videos and photos were based, were present and available for cross examination.  The Court found these circumstances, coupled with the limited purpose for which the video was used and admitted, provided the necessary "circumstantial guarantees of trustworthiness" to overcome any hearsay challenge under M. R. Evid. 803(24).  *Id.*

Before this Court, Zlahn maintains that the detective's testimony was inadmissible hearsay.  (Doc. 11-3 at 14-15.)  Zlahn explains the detective presented a detailed reenactment of the shooting scene, which he narrated, providing the witness's vantage points and his own hearsay statements regarding what the various witnesses could see.  *Id.* at 15.  Zlahn claims this testimony circumvented the authentication requirements and was not harmless and/or cumulative.  *Id.*

Again, the admission of this testimony turned on the state court's application of the Montana rules of evidence.  Thus, Zlahn has no independent avenue available to pursue for federal habeas relief based upon admission of this evidence.  See, *Rhoades*, 638 F. 3d at 1034 n. 5.  Moreover, given the fact that the detective's testimony was subject to cross-examination and all of the "vantage point

23

witnesses" were likewise present for trial and subject to cross examination, there is no indication that admission of this testimony had a substantial or injurious effect on the jury's verdict. *Brecht*, 507 U.S. at 637. Accordingly, the Montana Supreme Court's rejection of this claim was reasonable; Zlahn is not entitled to federal habeas relief.

### g.  Conclusion

In sum, Zlahn is not entitled to federal habeas relief on any of his evidentiary claims. The state court's rejection of these claims was not contrary to, or an objectively unreasonable application of clearly established Supreme Court law, and/or was not based on an unreasonable determination of the facts in light of the evidence presented. See, 28 U.S.C. § 2254(d); *Harrington*, 562 U.S. at 100-103.

### iii.    Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief – deficient performance by counsel and prejudice. 466 U.S. at 678. With respect to the performance prong, a petition must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id*. at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge in a strong presumption that counsel's conduct falls within the wide range of

24

reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009).  In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Strickland*, 466 U.S. at 696.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult.  *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123, 129. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.' ").

On appeal from the denial of his postconviction petition, Zlahn argued that

trial counsel provided ineffective assistance by failing to call Amber Scally, a witness who called 911, and who would have purportedly provided a contradictory account of the shooting.  Zlahn also claimed trial counsel erred in failing to locate an call an alibi witness, known only as "Derek"; counsel allegedly instructed Zlahn not to mention Derek during the trial proceedings.  (Doc. 11-2 at ¶ 8.)

The Montana Supreme Court determined Zlahn failed to overcome the presumption that trial counsel performed effectively, because it was objectively reasonable not to call Amber Scally (Scally) as a witness. (Doc. 11-1 at ¶ 10.)  The theory of the defense was that Bettie, not Zlahn, was the shooter.  Counsel believed Scally's husband, Keenan, provided a description that better supported the defense's theory.  Additionally, Scally stated in interviews that she was more focused on the victims of the shooting rather than the occupants of the vehicle.  *Id*. Accordingly, the Court determined counsel's decision not to call Scally was consistent with the defense's theory of the case and did not constitute deficient performance under the first prong of *Strickland.  Id*.

The Court also found it was objectively reasonable for counsel not to locate an alibi witness, known only by his first name.  *Id*. at ¶ 11.  The Court noted that the record indicated counsel discussed various means of identifying Derek with Zlahn, and that counsel appropriately weighed locating Derek based upon the defense's theory of the case.  *Id*.  Given these considerations and the lack of

identifying information, the Court found counsel acted reasonably in deciding not to locate Derek, and the decision fell within the deference afforded to counsel and did not constitute deficient performance under *Strickland*. *Id*.

Zlahn now argues defense counsel performed deficiently by electing not to call Scally as a witness once counsel was made aware during a pretrial interview that Keenan's memory of the shooting incident was fading. (Doc. 11-3 at 17.) By not calling Scally, the State was able to argue in closing that Keenan's testimony should be viewed skeptically because he confessed he did not have a clear memory of the event. *Id*. Zlahn argues the jury was then left to infer that Scally would have been the better witness and wonder why she was not called to testify. *Id*. Zlahn asserts he suffered prejudice and was denied a fair trial due to trial counsel's decision. In support of this argument Zlahn attaches a portion of the 911 call purportedly made by both the Scallys, (Doc. 11-4 at 4-5),[7] a portion of the pretrial defense interview with Keenan, *id*. at 7-8, and a portion of the state's closing argument. *Id*. at 10.

Zlahn also argues trial counsel was ineffective for failing to investigate his

---

[7] It appears that the pages Zlahn attached reference two separate 911 calls to dispatch. (Cf. page numbers on original documents) (Doc. 11-4 at 4 indicates the transcript page provided is page 4 of a 5-page transcript, while Doc. 11-4 at 5 represents page 2 of a 3-page transcript.) Additionally, in the second transcript, the female speaking to dispatch indicates she was driving, *id*. at 5, while in his pretrial interview, Mr. Scally said he was driving their vehicle at the time their call was placed to dispatch. *Id*. at 8.

alibi witness, "Derek."  (Doc. 11-3 at 18.)  Zlahn maintains he had advised trial

counsel several times that he was with his friend Derek at the time of the shooting,

and that he had discussed with counsel ways in which Derek might be identified

and located.  *Id*.  Zlahn apparently advised counsel that Sean Bowers could provide

information that would lead counsel to Derek, but counsel never sought Bowers's

assistance.  *Id*.  Zlahn asserts he was prejudiced by counsel's refusal to investigate

the alibi and locate Derek.

These are the same arguments that were presented and rejected in the state

courts.  Zlahn has provided nothing in his present petition to establish that the

Montana Supreme Court's decision denying his claim was unreasonable.  It

appears Zlahn believes that Scally would have testified that he was not the shooter,

thus exculpating him.  But there is nothing in the record before this Court to

indicate that Scally would have actually provided such testimony.  To the contrary,

trial counsel explained that he elected not to call Scally because she was more

focused on the victim of the crime, Grosulak, rather than the occupants of the

maroon van.  Accordingly, counsel determined her testimony was unnecessary.

Moreover, trial counsel believed Keenan provided a description of the shooter that

was more consistent with Bettie, not Zlahn, and that his testimony tended to

support the defense's theory of the case – that Bettie was the actual shooter.

Moreover, based upon the portion of the prosecution's closing argument attached

to Zlahn's petition, it appears the State was concerned about Keenan's testimony
and the defense's corresponding argument that Bettie was the shooter.  The state
spent an ample portion of its closing argument trying to discredit Keenan's
testimony.  See, (Doc. 11-4 at 10.)

It was also determined that counsel made a reasonable strategic decision not
to pursue calling Derek as a witness.  Zlahn did not establish in the state courts that
Derek actually exists.  Aside from his conclusory statement, there is nothing before
this Court that would establish Derek, in fact, exists or that Derek would have
provided a valid alibi for Zlahn.  But, setting that issue aside, it would have been
counter to the defense's theory of the case, that Bettie was the shooter, to
simultaneously pursue an alibi defense.  As set forth above, there were various
witnesses that testified and physical evidence that demonstrated Zlahn was in the
vicinity of van at the time of the shooting.  Thus, it was reasonable for trial counsel
to present its theory of the defense, and it was correspondingly not unreasonable
for counsel not to pursue a witness that did not support or could potentially be
damaging to the theory of defense.

Strategic decisions, such as the choice of a defense or which witnesses to
present, "are virtually unchallengeable" if "made after thorough investigation of
law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690.  Zlahn
has not established that trial counsel acted unreasonably or that he performed

deficiently.  Put another way, Zlahn has not demonstrated that trial counsel "made errors so serious that he was not functioning as 'counsel' guaranteed by the Sixth Amendment."  *Strickland*, 466 U.S. at 687.

As set forth above, this Court's review of the Montana Supreme Court's determination that trial counsel did not perform deficiently is "doubly" deferential, because *Strickland* requires state courts to give deference to choices made by counsel, and AEDPA, in turn, requires this Court to defer to the determinations of state courts.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011)(quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  Under the demanding deferential standard at issue here, Zlahn has not established deficient performance.

As both prongs of *Strickland* must be satisfied to establish a constitutional violation, a failure to satisfy either requires a petitioner's ineffective assistance of counsel claim be denied.  *Id*. at 697.  A federal habeas court considering an ineffective assistance of counsel claim need not address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish incompetence under the first prong."  *Siripongs v. Calderon*, 133 F. 3d 732, 737 (9th Cir.), cert denied, 525 U.S. 839 (1998).  Because Zlahn has not established deficient performance, this Court need not address *Strickland* prejudice.  The claim should be denied.

## IV.   Conclusion

Zlahn's petition should be denied for lack of merit; his claims do not survive

AEDPA review.  See, 28 U.S.C. § 2254(d).

## V.   Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules governing § 2254 Proceedings.  A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Zlahn has not made a substantial showing that he was deprived of a constitutional right.  Accordingly, this Court must afford deference to the Montana Supreme Court's resolution of Zlahn's denial of counsel and evidentiary challenges.  Likewise, Zlahn's ineffective assistance of counsel claim fails under the doubly deferential standards mandated by the application of both 28 U.S.C. § 2254(d) and *Strickland*. There are no close questions and there is no reason to encourage further proceedings in this Court.  A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1. Zlahn's Amended Petition (Doc. 11) should be DENIED.

2. The Clerk of Court should be directed to enter judgment in favor of
Respondent and against Petitioner.

3. A certificate of appealability should be DENIED.

### NOTICE OF RIGHT TO OBJECT
### TO FINDINGS & RECOMMENDATION
### AND CONSEQUENCES OF FAILURE TO OBJECT

Mr. Zlahn may object to this Findings and Recommendation within 14 days.

28 U.S.C. § 636(b)(1).  Failure to timely file written objections may bar a de novo

determination by the district judge and/or waive the right to appeal.

Mr. Zlahn must immediately notify the Court of any change in his mailing

address.  Failure to do so may result in dismissal of his case without notice to him.

DATED this 12th day of November, 2020.


*/s/ Timothy J. Cavan*
Timothy J. Cavan
United States Magistrate Judge